OPINION
 

 SHEA, Justice.
 

 This matter is before the Supreme Court on appeal from a decision of the Family Court terminating the parental rights of the respondent to her daughter, Kathaleen. The Family Court based its decision on findings made in conformity with General Laws of Rhode Island 1956 (1981 Reenactment) § 15-7-7(c). We affirm.
 

 The evidence in the case established that on January 30, 1977, the respondent, whom we shall refer to as Marie, then aged sixteen, gave birth to Kathaleen. At the time, Marie lived with her mother with whom she had a volatile and hostile relationship attributable, in part, to the mother’s abuse of alcohol.
 

 At Marie’s request, negotiations for Ka-thaleen’s adoption were conducted with Catholic Social Services from April 12,1977 through November 9, 1977, which negotiations were terminated when Marie’s mother refused to give her lawful consent.
 

 
 *13
 
 In February of 1978, a battered child report was filed when Kathaleen was treated for a bum on her leg. No charges were brought because the authorities accepted as plausible Marie’s explanation that the burn resulted when Kathaleen rolled against heating pipes beside her crib. On April 5, 1978, Marie voluntarily placed Kathaleen in foster care with Child Welfare Services because of her inability to care for the baby.
 

 During the ensuing years, the agency worked quite steadily with Marie with a view toward reuniting mother and child. Marie was informed by the agency that if she obtained gainful employment, found a suitable apartment, maintained weekly visits with Kathaleen, and most importantly, sought and actively participated in counseling sessions at the Providence Mental Health Agency, Kathaleen would be returned to her. Marie’s failure to comply with this plan would result in the agency’s petitioning for termination of parental rights.
 

 Marie followed through with the agency’s recommendations except that she persistently refused to seek counseling, maintaining that she did not need therapy. As a result, the agency filed a dependency and neglect petition in May of 1979 which was twice continued, the second time to January 10, 1980.
 

 In the interim, Marie gave birth to a second child and was living with the child’s father. In February of 1980, Marie agreed to admit to dependency. As a result, the agency discontinued the neglect portion of the petition and developed a new plan for unification. As in the past, Kathaleen’s return was conditioned upon Marie’s obtaining counseling. As part of the new plan, Kathaleen was returned for overnight visits once a week that were to increase in frequency until a thirty-day trial period could be reached by the third month. During the course of the plan, Marie experienced considerable difficulty taking care of both Ka-thaleen and the new baby. As a result, she asked that the agency remove Kathaleen. Moreover, she missed three scheduled counseling appointments.
 

 Discussions for Kathaleen’s adoption were renewed but discontinued in June of 1980 when Marie requested another trial period. Again, she was advised and urged to seek counseling and help with perfecting her parenting skills. However, Marie missed several scheduled visits during the fall and early winter of 1980. At one point during this final plan, the caseworker brought Kathaleen to Marie’s apartment for a visit but found the police there. They were summoned because of a disturbance involving Marie’s boyfriend in which Marie suffered broken bones in her foot. The caseworker canceled the visit and returned Kathaleen to her foster home.
 

 On November 21, 1980, the dependency case was again continued in Family Court, this time to January 15, 1981. A psychiatric evaluation of Marie ordered by the Family Court concluded that her ability to provide consistent parenting for Kathaleen was seriously doubtful. The evaluation disclosed that Marie had difficulty with interpersonal relationships, difficulty following through with commitments, and an inability to recognize her problems or appreciate her situation. On January 15 the court continued the case to March 12, 1981, for review. On that date, a petition for termination was filed based on allegations that attempts at reuniting Kathaleen with Marie were unsuccessful, she had not become actually involved in counseling, had moved without notifying the agency, and visitations were sporadic. On November 20, 1981, a Family Court justice found Kathaleen to be permanently neglected and terminated Marie’s parental rights.
 
 [1]
 

 In pertinent part, § 15-7-7 provides that
 

 
 *14
 
 “[t]he court shall, upon a petition duly filed after notice to the parent and hearing thereon, terminate any and all legal rights of the parent to the child, * * * if the court finds as a fact that notwithstanding reasonable efforts which shall be made by the said agency to encourage and strengthen the parental relationship: * * * * * *
 

 (c) The parent has a child in the care of a licensed or governmental child placement agency, either voluntarily or involuntarily, for a period of at least six (6) months and the court further finds that the integration of the child into the home of the parent is improbable in the foreseeable future due to conduct or conditions not likely to change. The court shall review the initial conduct or conditions which caused the child to come into the care of the licensed or governmental child placement agency and determine whether there has been a change in the circumstances of the parent.”
 

 In
 
 In re William,
 
 R.I., 448 A.2d 1250, 1257 n. 3 (1982), and in
 
 In re Armand,
 
 R.I., 433 A.2d 957, 962 (1981), this court adopted the test earlier enunciated by the Legislature of the State of New York to judge agency compliance with the reasonable-efforts requirement of § 1&-7-7. The agency must demonstrate by clear and convincing evidence that it (1) has cooperated with parents to design an appropriate program; (2) has made suitable arrangements for visitation; (3) has provided services and other assistance so that the problems preventing discharge from foster care may be resolved or ameliorated; and (4) has informed the parents about the child’s health, progress, and development.
 

 We find more than adequate evidence of the agency’s performance in these regards, particularly in its repeated efforts to inform Marie of the vital necessity of her accepting counseling services. The agency devised reunification plans, arranged and facilitated visits, and provided transportation for those visits even though Marie often had access to public transportation. The visits were increased in frequency and length even though there continued to be periods in which Marie would not faithfully keep the visits.
 

 Marie appears never to have accepted the seriousness of her problems. Although it became abundantly clear that she was unable to handle Kathaleen and her younger son together for prolonged periods, she continued to resist counseling. Notwithstanding her demonstrated inability to parent Kathaleen consistently in an acceptable manner, forcing her on occasion to ask that the child be removed from her home, she still persisted in her refusal to accept counseling services.
 

 At all times the caseworkers emphasized the importance of counseling designed to enable Marie to deal with her problems and to enable her to develop useful parenting skills. The counseling and support services recommended were designed to assist Marie in single parenting, to set goals for her, and to give her an opportunity to talk with someone outside her family so that she could better organize her life and bring about the return of her baby. The only counseling she did accept was with a tutor from the Providence Family Learning Center. Even her appointments with this counselor, however, were not kept faithfully.
 

 We have held that a parent is required to maintain contact with a child in foster care and that contact must consist of more than occasional periods of visitation. It must be “ ‘meaningful contact where a parent has exercised her parental obligation and has provided love, affection and guidance’ to her children.”
 
 In re Armand,
 
 R.I., 433 A.2d at 961 (quoting
 
 In the Matter of Klug,
 
 32 A.D.2d 915, 916, 302 N.Y.S.2d 418, 420 (1969) (Tilzer, J., concurring)). “The concomitant requirement that [a] parent plan for the future of the children places the responsibility [on the parent] ‘to formulate, and act to accomplish, a feasible and realistic plan’.”
 
 In re Armand,
 
 R.I., 433 A.2d at 961 (quoting
 
 Matter of Orlando F.,
 
 40 N.Y.2d 103, 110, 351 N.E.2d 711, 715, 386 N.Y.S.2d 64, 67 (1976)).
 

 
 *15
 
 A review of the entire record in this case leads us to the conclusion that Marie’s participation in reunification plans was more passive than active. Obtaining employment, obtaining a better apartment, and expressing a desire for increased visitation are not sufficient when the parent persists in her refusal to take any action to correct the most serious deficiency in her ability to care for the child. Marie’s persistence in refusing to accept counseling and other support services renders the possibility of integration of the child in question into her home in the foreseeable future highly improbable because it has become very clear that the conduct and conditions that caused the child to come into foster care are utterly unlikely to change.
 

 In view of the foregoing, it is our conclusion that the agency has met its burden by clear and convincing evidence. The Family Court justice was fully justified in finding that the conditions causing Kathaleen to come into foster care were unlikely to change in the foreseeable future.
 

 The decision of the Family Court terminating parental rights in this case is affirmed. The papers of the case are remanded to the Family Court.
 

 [1]
 

 . Although the Family Court made a finding of permanent neglect, the department did not bring this petition under the permanent neglect section. General Laws 1956 (1969 Reenactment) § 15-7-7(a).